FILED

2009 Oct-30  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

WILLIE BARNETT,

_____Plaintiff,

vs.                                                    CASE NO. CV-07-J-79-NW

CITY OF FLORENCE, ALABAMA,
et al.,

      Defendants.

## **MEMORANDUM OPINION**

Pending before the court is defendants' motion for summary judgment (doc. 32), defendants' brief and evidence in support of such motion (docs. 33, 34 and 35), plaintiff's evidentiary submissions and brief in response (docs. 42 and 43), and the defendants' reply (doc. 45).  Having considered all of the pleadings and submissions, as well as the relevant law, the court finds as follows:

Plaintiff brought this action against the City of Florence, Alabama ("Florence"), and three individual police officers employed by Florence due to circumstances surrounding the arrest of the plaintiff on April 22, 2006.[1]  Plaintiff

---

[1]In his response to defendants' motion for summary judgment, the plaintiff dismissed his claim of municipal liability against the City of Florence.  Plaintiff's response (doc. 43), at 1.  The court therefore considered plaintiff's claims only as they relate to the actions of the individual officers named as defendants.

states claims for illegal seizure and excessive force, pursuant to 42 U.S.C. § 1983, for violations of his Fourth and Fourteenth Amendment rights.

## FACTUAL BACKGROUND

The following facts preceding the plaintiff's arrest are not in dispute.  The parties agree that on April 22, 2006, the plaintiff was present at Carver Heights, a public housing complex, visiting his girlfriend.  Plaintiff depo. at 131-132, 141-142; Iria Roberson depo. at 12.  While inside her apartment, the plaintiff heard shooting and the plaintiff's girlfriend's daughter, Natasha, came in and said someone was shooting.  Plaintiff depo. at 155-156; Iria Roberson depo. at 22, 26.  Plaintiff asked where his girlfriend's grandchild was and went out to look for the child.  Plaintiff depo. at 157-158, 163; Iria Roberson depo. at 26-28.  They found her in another apartment.  Plaintiff depo. at 167-168; Natasha Roberson depo. at 32.  The plaintiff started back to his girlfriend's apartment, walking 25 to 30 feet behind Natasha.  Plaintiff depo. at 170-171; Iria Roberson depo. at 35; Natasha Roberson depo. at 41.  On his way back, he saw the officers' cars.  Plaintiff depo. at 173.  He saw spotlights from the cars, stopped walking, and put his hands up in the air.  Plaintiff depo. at 173-174; Iria Roberson depo. at 37-38; Natasha Roberson depo. at 53-54.  The plaintiff pointed back in the direction from which he had just come and said "That's who ya'll want."  Natasha Roberson depo. at 54-55.

The individual defendants, each police officers with the City of Florence, responded to a dispatch call that there was a fight with weapons in the vicinity of apartment 1414A in Carver Heights. Holt depo. at 119. While en route to Carver Heights, defendant Holt turned on the audio/video recording device in his patrol car. Holt depo. at 12. Plaintiff can be seen on the resulting video, walking through a grassy area in front of some apartments. Prior to defendant Holt arriving at the scene, another officer reported that he had a subject and a firearm in custody. Keeton depo. at 219, 278.

The remaining facts surrounding the plaintiff's arrest are disputed. Because this case is before the court on the defendants' motion for summary judgment, the court takes the remaining facts in the light most favorable to the plaintiff. Although the parties dispute plaintiff's exact demeanor when the video captured him walking, the video of the incident, submitted as defendant's exhibit D, shows officers approaching the plaintiff.[2] The court can best describe the plaintiff's walk as "sauntering." Prior to any of the officers getting out of their cars, the video shows the

---

[2]Vanessa Thompson, a neighbor, testified that "[t]he police had walked up to him for – I don't know for what. I don't know what it could have been for, because like I said, he was just walking out his back door, and he was trying to explain to him that he was looking for his granddaughter." Vanessa Thompson depo. at 51-52, 58. She testified, "They didn't even – like, they didn't even – as far as them saying what they said, they – I mean, to me, it was like they were aiming at him, because when they stopped, they went to him,. He let them know that he was looking for his granddaughter. After that, that's when it all just started happening." *Id.* at 60. She heard people saying "How wrong that was how they had did him..." *Id.* at 63.

plaintiff with his hands up, waiting on the officers to approach.  *See* plaintiff depo. at 178; Thompson depo. at 29.  Defendant Holt is heard on the video saying "Okay, I'm just going to check you out, okay?  I'm gonna make sure you're not the one, okay?  Turn around for me. Don't point at me.  Turn around."  According to Holt, he stopped the plaintiff because he was "walking away from the area looking back over his shoulder at us as he was leaving.  So, yes, I stopped him."  Holt depo. at 25.  Holt admits this stop was after he knew there was already  a suspect and a weapon in custody, but adds that the plaintiff was stopped within thirty seconds of that individual being arrested.  Holt depo. 27, 78.

All three of the officers stated that they were responding to a "shots fired" call. Keeton depo. at 23.  They all stated that such a call usually involves two or more individuals, they did not know how many people were involved, and the call stated to look for people running in the middle of the complex.  Keeton depo. at 25, 49, 278; Stanfield depo. at 146-147; Holt depo. at 45, 78, 80, 127-128.  The plaintiff was the first black male defendant Keeton saw in the area of the shooting.  Keeton depo. at 31.  Defendant Holt stopped the plaintiff to determine his involvement because he was leaving the area as they approached and was the closest person to the scene.  Holt depo. at 25, 237-238; Keeton depo. at 50.

Plaintiff was patted down while defendants Holt and Keeton held his arms behind his back. Plaintiff depo. at 182; Iria Roberson depo. at 42; Natasha Roberson depo. at 56. After a pat down, during which no weapons were found, plaintiff's wallet was removed from his pocket, his identification was "checked out," and a lack of any outstanding warrants was established. *See also* plaintiff depo. at 182, 185; Holt depo. at 30-31; Keeton depo. at 61-62. At this point, Holt intended to release the plaintiff. Holt depo. at 99. This entire time, the plaintiff was telling the officers "It ain't me. It ain't me." Roberson depo. at 42.

According to the officers, and as heard on the video, the plaintiff was cursing and combative while his license check was run. Keeton depo. at 63, 65, 301; Holt depo. at 158-159, 241-243, 245; 330-331. Thus, rather than release the plaintiff after the license check, officer Keeton continued to hold onto the plaintiff. Keeton depo. at 61-62, 68, 308. During this time, the plaintiff informs defendant Holt that they have "rumbled before" and "don't go there," which defendant Keeton perceived as a threat. Keeton depo. at 308, 312. These statements are clearly heard on the video.

At this point, the video shows the plaintiff being pushed away by Keeton and being told "You need to get out of here. Get out of here." *See also* Keeton depo. at 95-98, 121. Keeton also informs the plaintiff that he is "trespassed" from public housing property. Keeton depo. at 334; Holt depo. at 331-333. Although both the

plaintiff and defendants rely on the content of the video recording to establish what happened next, the specific events in question are not clearly visible on the recording because they take place on the far side of another police car parked in front of the police car which had the video camera recording.

At deposition, the plaintiff testified that after the cuffs were removed, he turned around and looked at defendant Keeton.[3]  Plaintiff depo. at 188.  He does not remember saying anything.  Plaintiff depo. at 188.  He remembers Keeton shoving him and him shoving Keeton.[4]  Plaintiff depo. at 189-191. *See also* Iria Roberson depo. at 42, 44; Natasha Roberson depo. at 58-60; Keeton depo. at 334-335. According to Keeton, he pushed the plaintiff away from him because the plaintiff appeared to be tensing up to go after defendant Holt, and could have been a threat to

---

[3]According to Keeton, plaintiff was never cuffed, but his hands were being held behind his back by Keeton and Holt.  Keeton depo. at 61-62; Holt depo. at 153.  No one disputes that the plaintiff was restrained in some manner at this time.

[4]Although plaintiff's pushing Keeton was described by the various officers as a "charge," "a lunge" and an "assault," Keeton admits that he pushed the plaintiff and the plaintiff pushed him back.  *See* Keeton depo. at 389; Stanfield depo. at 91-92, 94, 98, 101 (stating the plaintiff "rared back in an aggressive manner"); Holt depo. at 131-132.  Stanfield testified that after the plaintiff "attacked and assaulted" Keeton, the officers "took him down" for his own protection and theirs because the plaintiff "could have fallen down and busted his head open."  Stanfield depo. at 265.  According to defendant Holt, plaintiff "aggressively attack[ed] an officer" by "charging" at defendant Keeton, and "charged at [Holt] and was stopped by officer Keeton." Holt depo. at 22-23; 163-166.  According to defendant Holt, the officers were attempting to release the plaintiff when he charged at defendant Holt.  Holt depo. at 23-24; 99.  Holt stated that had plaintiff "walked away, he wouldn't have been arrested; he wouldn't have got his elbow dislocated during that incident, and we wouldn't be here now."  Holt depo. at 24.

himself or defendant Holt.  Keeton depo. at 95-99, 113, 139; 391; *see also* Holt depo.

at 305; 322.  The plaintiff jerked his right arm away from defendant Holt and was

looking at him.  Keeton depo. at 322, 324.  *See also* Stanfield depo. at 31-33; 297,

299; Holt depo. at 152.

Because plaintiff pushed Keeton back, Keeton responded to what he considered

a threat.  Keeton depo. at 119.  He moved toward the plaintiff to arrest him, although

he never stated to the plaintiff that he was under arrest.  Keeton depo. at 108, 119-

120, 198; 345.  *See also* Stanfield depo. at 89; Holt depo. at 195; 357. The plaintiff

stated the next thing he remembers is "I was going toward the car."  Plaintiff depo.

at 189.  When asked if Keeton went backwards when the plaintiff pushed him, the

plaintiff testified "I don't know if he did or not because I went flying again."  Plaintiff

depo. at 192.  According to Natasha Roberson, Keeton picked plaintiff up and

slammed him against the police car.  Natasha Roberson depo. at 61.  Defendant

Keeton admits as much.[5]  Keeton depo. at 101-102, 106, 185, 202; 337; 360.

_____

[5]Defendant Keeton's testimony closely matches with events as described by the plaintiff.
The other two defendants' version of events is vastly different from those of the plaintiff.
According to defendant Stanfield, all three officers bounced off the car and all three officers had
to tackle the plaintiff to the ground.  Stanfield depo. at 254-255.  According to defendant Holt,
the plaintiff and defendant Keeton "collided.  And when they collided, they spun around and
ended up going toward the ground....they impacted together, spun around.  Officer Keeton took
him to the ground.  Or actually I think they went over to the car and then to the ground."  Holt
depo. at 171-172.  Holt attributed plaintiff's "charge" of Keeton as the "force" causing both
Keeton and plaintiff to spin around, hit the car and then the ground.  Holt depo. at 184, 197.  He
believed they both "ran into" the car.  Holt depo. at 196.  According to Keeton, this is not what

According to plaintiff, and visible on the video, the next thing that happens is the plaintiff being slammed against the police car hard enough for the car to rock.  Iria Roberson testified that "the next thing I seen was the car bounce and him coming off of it."   Roberson depo. at 44.   According to the plaintiff, either Holt or Keeton grabbed him and slammed him down on the car.  Plaintiff depo. at 193. He does not know which officer it was.  Plaintiff depo. at 194.  He was then thrown to the ground by Holt or Keeton.[6]  Plaintiff depo. at 195; Keeton depo. at 180.  According to Iria Roberson, once plaintiff rebounded off the car, the officers kicked him and stomped him in his back.[7]  Iria Roberson depo. at 46, 49.  Ida Thompson, another witness, testified that "the police came up on him, and [plaintiff] asked. 'What did I do?' And the police, they started throwing him against the police car and throwed him on the ground and started beating him."  Ida Thompson depo. at 17, 31. Vanessa Thompson, another witness, testified that she remembers seeing the officers hitting plaintiff.

---

happened.

[6]Ida Thompson testified as follows:
Q. .... When he was thrown up against the car, do you know, was he thrown up with his front towards the car, or was his back toward the car?
A.  I don't know.  All I seen, they throwed him up against the car.
Q.  Okay.  And then after they threw him up against the car, what happened next?
A.  Then they throwed him on the ground.
Thompson depo. at 33.

[7]Each of the officers denies hitting the plaintiff.  Stanfield depo. at 21, 305; Holt depo. at 187.

Vanessa Thompson depo. at 65.  She never saw plaintiff swing back or push back at the officers.  *Id*. at 69.  She remembers them hitting him and remembers him being on the ground.  Id. at 75.  After the plaintiff was on the ground, she thinks officers hit him about five times.  *Id*. at 118.

Once on the ground, one officer said "give me your arm" and the plaintiff tried, while the other officer had his feet on plaintiff's back.  Plaintiff depo. at 195-196. His other arm was already behind his back.  Plaintiff depo. at 196.  He was not trying to resist.  Plaintiff depo. at 197, 199.  Although the testimony differs, defendants Keeton and Stanfield believe plaintiff's left arm was out by his side, not underneath his body to resist arrest.  Keeton depo. at 170-171; Stanfield depo. at 87.  However, defendant Holt testified he was trying to wrestle the plaintiff's arms out from under him.  Holt depo. at 186, 188.

At some point, one of the officers gets the plaintiff's left arm and the plaintiff feels something "pop."  Plaintiff depo. at 199, 299.  This occurs on the far side of the police car and is not visible on the video tape.  According to Iria Roberson, while Keeton was putting handcuffs on plaintiff and plaintiff was telling the officers they broke his arm, Keeton kept hollering "Quit resisting."  Iria Roberson depo. at 50.  Iria Roberson heard plaintiff reply "I'm not resisting. I'm not resisting."  Iria Roberson depo. at 51.  At that point plaintiff is lifted up and placed in the police car.  Plaintiff

depo. at 201.  The plaintiff knows there were four officers present, but he can only recount what Holt and Keeton did.  Plaintiff depo. at 201.

The events while on the ground are not visible on the video at all.  In the plaintiff's version of events, he did not resist arrest, his left arm was beside him, and defendant Keeton grabs one arm, defendant Holt gets the other arm, and the plaintiff felt something in his arm "pop."  Plaintiff depo. at 199, 296-297.  Upon being arrested, the plaintiff told Keeton, "Man, you just broke my arm" to which Keeton responded, "It's not broke."  Plaintiff depo. at 220-221, 298-299.  By affidavit, the plaintiff asserts he remembers defendant Keeton holding his left wrist, pulling his arm straight out from his side at a right angle, and then stomping on his arm with a foot or knee.  Plaintiff's affidavit, ¶ 6.  The plaintiff was charged with public intoxication and resisting arrest.  Upon arrival at the jail, defendant Keeton looked at plaintiff's arm and took the plaintiff to an emergency room, where the plaintiff was treated for a dislocated elbow.  Plaintiff depo. at 222-223.  The charges were later nolle prossed.[8] Plaintiff depo. at 257-258.

At the emergency room, the plaintiff had to be put to sleep to have his elbow put back in place, and a temporary cast was put on it.  Plaintiff depo. at 238-239.

---

[8]The defendants assert that the charges were dropped as part of a plea deal from an earlier charge.  The plaintiff vehemently disputes this, stating that he pleaded guilty to the earlier charges because he was, in fact, guilty.  Plaintiff depo. at 259-262.

Several days later, the plaintiff underwent surgery for his elbow to be reset, and some type of hardware was inserted into it.  Plaintiff depo. at 242-243; Dr. Davis depo. at 11.  Two weeks later, the plaintiff had a second surgery to put more pins and an external fixator in his arm, after it dislocated again.  Plaintiff depo. at 245; Dr. Davis depo. at 18, 20, 22-23.  A third surgery added more pins due to a broken one, which was also left in place.  Plaintiff depo. at 249; Dr. Davis depo. at 30-31.  He underwent a fourth surgery on his elbow later to remove the external fixator. Plaintiff depo. at 249-250; Dr. Davis depo. at 36.  The plaintiff's arm was in a brace, he went to physical therapy, and he was unable to work in his job as a roofer from April 2006 until December 2006.  Plaintiff depo. at 243-244; Dr. Davis depo. at 33-38.

## II. STANDARD OF REVIEW

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir.1997).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001);

*Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000).  With these standards in mind, the court considers each of the plaintiff's claims.

## III.  LEGAL ANALYSIS

42 U.S.C. § 1983 prohibits a person, acting under color of state law, from depriving another person of his or her rights secured by the United States Constitution. *See* 42 U.S.C. § 1983.  Section 1983 creates no substantive rights on its own, but merely provides a remedy for deprivation of federal constitutional rights. *Whiting v. Traylor*, 85 F.3d 581, 583 (11th Cir.1996).  To prevail on a suit under § 1983, the plaintiff must show both a deprivation of federal rights and that said deprivation was by a person acting under color of state law.  *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir.1992).

The defendants assert that they are entitled to qualified immunity.  Qualified immunity provides "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir.2001)(additional quotations omitted).  To receive qualified immunity, each of the officers in question must first prove he was acting within the

13

scope of his discretionary authority when the allegedly wrongful act occurred. *Lee*, 284 F.3d at 1194.

The defendants assert, and the plaintiff does not dispute, that the defendants were acting within their discretionary authority at all times relevant to the allegations of the amended complaint. Therefore, the plaintiff bears the burden to show that qualified immunity is not appropriate. *See Id.* To do so, the plaintiff must show both that a violation of a constitutional right occurred, and that the right in question was clearly established. *See e.g., Draper v. Reynolds*, 369 F.3d 1270, 1274-75 (11th Cir.2004); *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir.2003). In *Rodgers v. Horsley*, the Eleventh Circuit further explained that "[f]or a 'right' to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right.'" *Rodgers*, 39 F.3d 308, 310 (11th Cir.1994) (emphasis in *Rodgers*) citing *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

A.  **Illegal Seizure**:

Under the Fourth Amendment, there is a clearly established right to be free from unlawful seizure. *See e.g., Skinner v. City of Miami, Fla.*, 62 F.3d 344, 347 (11th Cir.1995). A seizure occurs when a police officer, "by means of physical force or a show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*,

392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879 n.16, 20 L.Ed.2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").  A person has been arrested when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed [he] was not free to leave." *United States v. Hammock*, 860 F.2d 390, 393 (11th Cir. 1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

The plaintiff argues there was no legitimate basis for the initial stop.  Plaintiff's response, at 14.  Given the facts before this court, from the moment the defendant officers stopped the plaintiff, the plaintiff was not free to walk away.  Thus, the court considers the issue of whether the defendants' initial stop of the plaintiff was proper. "[A]n officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth Amendment." *United States v. Hunter,* 291 F.3d 1302, 1307 (11th Cir.2002).  An investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983).  The officer conducting such a stop must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S.

411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).  See also *United States v. Sokolow,* 490 U.S. 1, 7-8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)(requiring an officer to have "some minimal level of objective justification" for the stop); *United States v. Powell*, 222 F.3d 913, 917 (11th Cir.2000).

Applying the facts as known to the officers, the court finds the initial stop to have been reasonable.  The three officers knew there had been "shots fired."[9]  They knew one suspect and one firearm had been apprehended, but they had no knowledge of how many individuals were involved in the "shots fired" incident.  The plaintiff was stopped less than one minute after the first suspect was detained.  He was in the general area of where a crime had been committed.  Given that, the initial stop of the plaintiff was not unreasonable.  Because of his combative demeanor, the court does not conclude that the continued detention of the plaintiff, for an additional one to two

---

[9]In *Illinois v. Wardlow*, the Supreme Court observed that:

An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis. *Adams v. Williams*, 407 U.S. 143, 144, 147-148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

*Illinois v. Wardlow*,  528 U.S. 119, 124, 120 S.Ct. 673, 676 (2000).

minutes, was improper either.  The court also does not find the initial restraint of the plaintiff unlawful, given the plaintiff's behavior.  During an investigatory stop, an officer can handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to safety.  *See United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir.1989); *United States v. Blackman*, 66 F.3d 1572, 1576-77 (11th Cir.1995); *United States v. Kapperman*, 764 F.2d 786, 790-91 & n. 4 (11th Cir.1985). Because the court concludes that the original detention of the plaintiff was not in violation of the plaintiff's constitutional rights, the court does not consider whether the defendants are shielded from liability by qualified immunity on this issue.

At the point that defendant Keeton told the plaintiff to "get out of here" and gave him a push away, the plaintiff was free to leave, but chose not to do so.[10]  Rather than walk away, the plaintiff elected instead to turn around and push defendant Keeton back.  After the plaintiff pushed defendant Keeton, defendant Keeton decided to arrest the plaintiff.  Pursuant to the Fourth Amendment, a police officer must have probable cause to make a warrantless arrest. *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir.2002).  Probable cause to arrest exists when law enforcement officials

---

[10]The plaintiff argues that "[a]fter Barnett was held and frisked and determined not to have a weapon, he had a right to go on his way."  Plaintiff's response, at 16.  Perhaps in recognition of this, the defendant officers told plaintiff to "get out of here." *See e.g., Illinois v. Wardlow,* 528 U.S. 119, 126, 120 S.Ct. 673, 677 (2000) ("If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way").

have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime. *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir.2002); *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir.1998).

"In the context of a claim for false arrest, an officer is entitled to qualified immunity where that officer had 'arguable probable cause'" to effectuate the arrest. *Davis v. Williams*, 451 F.3d 759, 762-63 (11th Cir.2006). Arguable probable cause exists where an objectively reasonable officer in the same circumstances and possessing the same knowledge as the officers effectuating the arrest could have believed that probable cause existed. *Id. See also Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir.1998).

Here, the plaintiff was arrested for public intoxication and resisting arrest. The plaintiff argues that the defendants did not have justification to arrest plaintiff for public intoxication. As noted by the plaintiff, the intoxication must actually cause the arrestee to endanger himself, another person, or property or cause him to annoy another person by boisterous and offensive conduct. Plaintiff's response, at 18. Although plaintiff's level of intoxication is in dispute, the plaintiff admits to consuming multiple alcoholic beverages prior to the incident, the officers each testified that the plaintiff smelled strongly of alcohol, and the plaintiff was hostile and

combative during the initial stop.  Given this set of factors, the court finds that any objectively reasonable officers in these officers' circumstances could have believed probable cause existed to arrest the plaintiff for public intoxication.  Whether or not the plaintiff was actually within that definition, as defined under Alabama law, is not the relevant inquiry.  The court therefore finds that the defendant officers had arguable probable cause to arrest the plaintiff for public intoxication.  Because the court concludes that such arguable probable cause exists, the officers are protected by qualified immunity.

### B. **Excessive Force**

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [person's] constitutional rights." *Neal v. Fulton County Bd. of Educ.*, 229 F.3d 1069, 1076 (11th  Cir.2000) (internal quotation omitted). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir.2002) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "In order to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee,* 284

19

F.3d at 1197 (quotation omitted).  *See also Garrett v. Athens-Clarke County, Ga.*, 378

F.3d 1274, 1279 (11th Cir.2004).  This must be decided "on a case-by-case basis from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993)

(internal quotation marks omitted).

In considering whether the plaintiff's constitutional right to be free from

excessive force was violated, the court must look at the totality of the circumstances,

"including the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight." *Garrett v. Athens-Clarke County, Ga.,* 378

F.3d 1274, 1279 (11th Cir.2004) (quoting *Lee*, 284 F.3d at 1197-98).

> The Supreme Court has emphasized that there is no precise test or
> "magical on/off switch" to determine when an officer is justified in
> using excessive or deadly force. *Scott*, 550 U.S. at 382, 127 S.Ct. at
> 1777; *see also Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. Nor must
> every situation satisfy certain preconditions before deadly force can be
> used. See *Scott*, 550 U.S. at 382, 127 S.Ct. at 1777. Rather, the
> particular facts of each case must be analyzed to determine whether the
> force used was justified under the totality of the circumstances. *See
> Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. "[I]n the end we must still
> slosh our way through the factbound morass of 'reasonableness.' " *Scott*,
> 550 U.S. at 383, 127 S.Ct. at 1778.

*Garczynski v. Bradshaw,* 573 F.3d 1158, 1166 (11th Cir.2009).

20

In the facts before this court, the plaintiff pushed a police officer. According to the defendants, he appeared to make a move to swing at or lunge at one officer, and then actually pushed a different officer. The plaintiff admits that, after he was pushed by defendant Keeton, he pushed him back. At that point, defendant Keeton pushed the plaintiff into a patrol car and "took him to the ground."[11] In the process of attempting to handcuff the plaintiff for public intoxication, the plaintiff suffered a dislocated elbow. Given the plaintiff's actions to that point, the officers had reason to believe that the plaintiff posed an immediate threat to their safety.

According to the defendants, the plaintiff resisted the officers' attempts to handcuff him after he was on the ground. According to the plaintiff, he was attempting to give the officers his left arm, which was beside him. Plaintiff depo. at 196. He testified that somebody had their foot on his back, somebody had his right wrist, somebody was hitting him in the side, and he felt his left arm pop. Plaintiff depo. at 196-197. He does not know exactly what caused it. Plaintiff depo. at 199. However, the plaintiff further testified that

> A. I was not resisting.
> Q. Were you trying to keep him from putting your left arm behind your back?

---

[11] Oddly, plaintiff's counsel asserts the plaintiff initially had his arms underneath him, while the plaintiff himself testified this was not the case. *See* plaintiff's response at 21, plaintiff depo. at 296-297.

21

A. I can't recall.  It's possible.
Q.  Okay.  And as you were trying to keep him from putting your left arm behind your back, is that when you heard it pop?
A.  It's a possibility that's when it was.  I don't know.  That's really –

Plaintiff depo. at 199-200.

Viewing the events in the light most favorable to the plaintiff, and applying the factors of *Garrett, supra,* the court finds that the crime at issue was of minimal severity, the plaintiff had posed an immediate threat to the officers, but that he was not actively resisting arrest or attempting to evade arrest.  As the court in *Garrett* noted, the situation confronting the officers must be viewed with "the eye of the objectively reasonable officer on the scene." *Id.*, 378 F.3d 1281.  Indeed, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded. *Garczynski,* 573 F.3d 1158 at 1166, citing *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

Even if the court found a constitutional violation occurred in the application of the force in question, the court must then consider whether qualified immunity protects the defendant officers.  Given the requirements for analyzing the facts as set forth by the Eleventh Circuit, the court concludes that "defendants' acts were not so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer, facing the circumstances, would have known that the

acts violated the pre-existing federal law." *Garrett v. Athens-Clarke County, Ga.,* 378 F.3d 1274, 1281 (11th Cir.2004).

This court is loathe to find that force which causes an elbow to dislocate is not excessive. However, it is not the injury itself, but the cause of that injury this court must consider. In *Draper v. Reynolds*, the Eleventh Circuit examined the use of a taser gun on an individual who, like the plaintiff here, was "hostile, belligerent, and uncooperative." *Id.*, 369 F.3d 1270, 1278 (11th Cir.2004). The Court found

> Because Draper repeatedly refused to comply with Reynolds's verbal commands, starting with a verbal arrest command was not required in these particular factual circumstances. More importantly, a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt. Thus, there was a reasonable need for some use of force in this arrest.

*Draper*, 369 F.3d at 1278.

While several witnesses allege that the plaintiff was punched in the side, the plaintiff does not claim an injury from this. He claims the injury to his elbow was the result of excessive force. He knows he heard a "pop." In the light most favorable to the plaintiff, one of the defendants put a foot on his left arm, in trying to handcuff the plaintiff. Even if the court concluded that a violation of the plaintiff's rights occurred,

23

> [t]he next inquiry under *Saucier* is whether, at the moment [the officer] acted, "every objectively reasonable police officer would have realized the act[ ] violated already clearly established federal law." *See Garrett*, 378 F.3d at 1278-79 (citing *Saucier*, 533 U.S. at 201-02, 121 S.Ct. at 2151) (emphasis added); *see also Hope*, 536 U.S. at 736, 122 S.Ct. at 2513; *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir.2003).

*Baltimore v. City of Albany, Ga.,*  183 Fed.Appx. 891, 899 (11th Cir.2006).

Here, the force was not so excessive that the court can conclude that an objectively reasonable police officer would realize the act violated clearly established law.  The plaintiff testified that an officer "had my left arm, and evidently – I don't know.  The only thing I know is, I felt something pop."  Plaintiff depo. at 199.  Application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.  *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000).  Given that the circumstances confronting the defendants, "without regard to their underlying intent or motivation," were "uncertain and rapidly evolving," thereby requiring "split-second judgments" as to how much force was necessary,  *Garczynski*, 573 F.3d at 1166-1167 (quoting *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872), the court finds that the defendant officers did not act outside the bounds of reasonableness.

## CONCLUSION

Having considered the foregoing, and being of the opinion that the defendants are entitled to summary judgment in their favor on both counts of the complaint, for the reasons set forth herein, the court shall grant the defendants' motion for summary judgment by separate order.

**DONE** and **ORDERED** this the 30th day of October, 2009.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE